IN THE SUPREME COURT OF NORTH CAROLINA

2022-NCSC-36

No. 227A21

Filed 18 March 2022

IN THE MATTER OF: H.R.S.

Appeal pursuant to N.C.G.S. § 7B-1001(a1)(1) (2019) from orders entered on 28 April 2021 by Judge Thomas B. Langan in District Court, Stokes County. This matter was calendared for argument in the Supreme Court on 18 February 2022 but determined on the record and briefs without oral argument pursuant to Rule 30(f) of the North Carolina Rules of Appellate Procedure.

*Jennifer Oakley Michaud for petitioner-appellee Stokes County Department of Social Services.*

*James N. Freeman Jr. for appellee Guardian ad Litem.*

*Robert W. Ewing for respondent-appellant mother.*

NEWBY, Chief Justice.

Respondent-mother appeals from the trial court's orders terminating her parental rights[1] to H.R.S. (Heather).[2] After careful review, we affirm the trial court's

---

[1] Respondent also noticed an appeal from the trial court's permanency planning order resulting from a hearing on 21 January 2021, but she does not present any argument as to that order in her brief. Thus, this argument is waived. *See In re E.S.*, 378 N.C. 8, 2021-NCSC-72, ¶ 19 (holding that an argument was waived under N.C. R. App. P. 28(a) because the respondent did not present or discuss that argument in the brief).

[2] A pseudonym is used in this opinion to protect the juvenile's identity and for ease of reading.

orders.

Heather was born on 15 August 2017 in Forsyth County. On 10 April 2019, the Stokes County Department of Social Services (DSS) received a child protective services report regarding Heather due to a domestic violence incident and concerns regarding respondent's substance abuse. At the time, respondent and Heather lived in the home of Heather's maternal grandparents with several relatives. In the days leading up to the incident, respondent "exhibited signs of hallucinations"—claiming "that she was speaking with a deceased individual"—and also "exhibited paranoia that those in the home were going to injure her." On 10 April 2019, respondent came home with Heather and appeared to be under the influence of drugs or alcohol. The maternal great-grandmother came outside and asked respondent to leave. Ignoring the maternal great-grandmother, respondent went inside and stabbed the maternal grandfather repeatedly. Respondent was arrested and charged with attempted first-degree murder and felony assault with a deadly weapon with intent to kill inflicting serious injury.

That same day, the social worker assigned to Heather's case learned that respondent did not want Heather to remain in the home with the maternal grandparents. Respondent wanted Heather to be placed with Heather's paternal grandparents. After an investigation, however, the social worker determined that Heather's paternal grandparents could not serve as a placement due to their criminal

history. That day, the social worker placed Heather with her maternal uncle; Heather and her maternal uncle were to reside at a neighbor's home.

¶ 4 On 11 April 2019, the social worker contacted Heather's father, who was incarcerated at the Forsyth County Jail.[3] Heather's father was concerned because he was "aware of [respondent] and [Heather's maternal uncle] using [m]ethamphetamines together at the neighbor's home." DSS then filed a juvenile petition alleging that Heather was a neglected juvenile because she "live[d] in an environment injurious to [her] welfare."[4] The trial court entered a nonsecure custody order which gave custody of Heather to DSS and authorized her placement with a foster parent. Thus, Heather was removed from the care of her maternal uncle on 11 April 2019 and placed in a foster home. On 16 April 2019, the trial court ordered DSS to perform a kinship assessment on Heather's maternal great-aunt and great-uncle; Heather was placed with them on 22 April 2019.

¶ 5 Over the next month, DSS continued working with respondent's family to find an appropriate relative placement. The maternal grandparents "completed a home study in May [of 2019] and were in the process of being considered for placement." Heather's maternal grandfather ultimately refused to submit to a hair follicle test

---

[3] The trial court also terminated the parental rights of Heather's father, but he did not appeal the trial court's order. Thus, we only recount the actions of Heather's father as relevant to respondent's arguments.

[4] The juvenile petition also alleged that Heather was a dependent juvenile. DSS voluntarily dismissed the dependency allegation without prejudice on 25 July 2019.

and told the social worker on 31 May 2019 that he and the maternal grandmother "wished to withdraw from consideration of their home as a potential placement." After a social worker requested that Heather's maternal uncle undergo a drug screen, he also withdrew from consideration the same day. As noted in a DSS court report filed on 29 July 2019,

> [d]uring the course of [31 May 2019], [Heather's] current placement provider was having chest pains and admitted into the hospital. They requested respite care for [Heather] over the weekend. The following Monday, [the social worker] took [Heather] to the pediatrician where she was diagnosed with the viral infection of hand[,] foo[t,] and mouth. [The social worker] . . . then traveled to [Heather's] maternal great[-]aunt and [great-]uncle's home to discuss [the] most recent decisions by [Heather's maternal uncle]. Both adults were visibly upset while expressing their love for [Heather] and wanting what is best for her. The placement providers were upfront and honest in the beginning [of the placement] about their inabilities to do this long term. [Heather's maternal great-aunt and great-uncle] were adamant they only wanted what was best for [Heather] and that being with a foster parent was in her best interest.

Having already determined that Heather's paternal grandparents were not an appropriate placement, DSS returned Heather to her previous foster placement on 31 May 2019. Heather remained in this placement throughout the remainder of the proceedings.

¶ 6      While incarcerated, respondent was charged with assault on a government official and resisting a public officer and was placed on suicide watch. After the trial

court held a hearing regarding the juvenile petition on 25 July 2019, the trial court found that Heather was a neglected juvenile because she "was exposed to substance abuse and therefore lived in an environment injurious to her welfare." The trial court set the permanent plan for Heather as reunification with her parents, with a concurrent plan of adoption. The trial court concluded that visitation with respondent was "not in [Heather]'s best interests, as [respondent] remain[ed] incarcerated." Moreover, the trial court ordered respondent to "enter into a case plan and comply with its terms." Respondent entered into her case plan on 30 January 2020. On 21 September 2019, respondent was convicted of assault on a government official and resisting a public officer. On 22 October 2019, respondent was convicted of attempted first-degree murder and assault with a deadly weapon with intent to kill inflicting serious injury. Respondent will remain in prison until at least October of 2023.

¶ 7        K.T.,[5] a cousin of Heather's father, and her husband J.T. became involved in the case in January of 2020. K.T. and J.T. live in Hagerstown, Maryland, in a three-bedroom ranch house on at least an acre of land. J.T. is a sergeant with the Maryland State Police; he is a shift commander responsible for other troopers. On 1 January 2020, several months after Heather was returned to her foster placement, K.T. and J.T. learned from a relative that Heather was in DSS custody; Heather's father did not initially inform them. That day, K.T. called DSS several times but was

---

[5] Initials are used for these relatives to further protect the juvenile's identity.

unable to make contact because DSS was closed. During January and February of 2020, K.T. and J.T. spoke with DSS employees on the phone and visited North Carolina. DSS informed K.T. and J.T. that DSS was not "seeking any placement with family outside the state because the primary goal was supposed to be reunification." After March of 2020, K.T. and J.T. did not speak with DSS again for several months. In May of 2020, while visiting North Carolina, K.T. spoke with Heather's father, who was "very optimistic that he was getting [Heather] back at that time."

After a review hearing on 16 July 2020, the trial court changed Heather's primary permanent plan to termination of parental rights and adoption, with a secondary plan of reunification. DSS filed a motion to terminate respondent's parental rights on 17 September 2020 on the grounds of neglect, willfully leaving the juvenile in foster care while failing to make reasonable progress, and dependency. *See* N.C.G.S. § 7B-1111(a)(1), (2), and (6) (2021). On 22 December 2020, Heather's father filed a "Motion for Expedited Inquiry of Placement" which requested the trial court to "[o]rder DSS to complete an expedited inquiry into placement with" Heather's paternal grandmother or K.T. In its order denying the father's motion, the trial court found:

> 6. The juvenile has never met [K.T.], who resides in Maryland. Placement with [Heather's paternal grandmother] was evaluated and determined to be against [Heather's] best interests, earlier in the case.
>
> . . . .

8. [K.T.] lives in Maryland, and an Interstate Compact Home Study would be required to investigate her suitability for placement. Because of the affinity between [K.T.] and the juvenile, the case does not qualify for an expedited home study.

. . . .

12. [K.T. and J.T.] did not contact the Stokes [County] Department of Social Services prior to the initial disposition of the case. The father contacted the Stokes [County] Department of Social Services regarding [K.T. and J.T. on] 12/9/2020 for the first time.

The trial court therefore concluded that "[i]t is contrary to the best interests of the juvenile to be taken from her foster home, where she has lived for 20 months, and placed with relatives." Thus, the trial court denied the father's motion.

The motion to terminate respondent's parental rights was heard on 10 February 2021 and 26 February 2021. In a written order entered on 28 April 2021, the trial court determined that grounds existed to terminate respondent's parental rights under N.C.G.S. § 7B-1111(a)(1) and (2). In a separate written order entered the same day, the trial court concluded it was in Heather's best interests to terminate respondent's parental rights. Accordingly, the trial court terminated respondent's parental rights. Respondent appeals.

A termination of parental rights proceeding consists of an adjudicatory stage and a dispositional stage. N.C.G.S. §§ 7B-1109, -1110 (2021); *In re Montgomery*, 311 N.C. 101, 110, 316 S.E.2d 246, 252 (1984). Respondent does not challenge the grounds

for termination adjudicated by the trial court under N.C.G.S. § 7B-1111(a), nor does respondent challenge the findings of fact in the trial court's disposition order. Rather, respondent argues the trial court erred by concluding that terminating her parental rights was in Heather's best interests.

"A trial court's determination concerning whether termination of parental rights would be in a juvenile's best interests 'is reviewed solely for abuse of discretion.'" *In re S.D.C.*, 373 N.C. 285, 290, 837 S.E.2d 854, 858 (2020) (quoting *In re A.U.D.*, 373 N.C. 3, 6, 832 S.E.2d 698, 700 (2019)). "Under this standard, we defer to the trial court's decision unless it is 'manifestly unsupported by reason or one so arbitrary that it could not have been the result of a reasoned decision.'" *In re A.K.O.*, 375 N.C. 698, 701, 850 S.E.2d 891, 894 (2020) (quoting *In re Z.A.M.*, 374 N.C. 88, 100, 839 S.E.2d 792, 800 (2020)). When determining whether termination of a parent's rights is in a child's best interests,

> [t]he court may consider any evidence, including hearsay evidence as defined in [N.C.]G.S. [§] 8C-1, Rule 801 [(2021)], that the court finds to be relevant, reliable, and necessary to determine the best interests of the juvenile. In each case, the court shall consider the following criteria and make written findings regarding the following that are relevant:
>
> > (1) The age of the juvenile.
> >
> > (2) The likelihood of adoption of the juvenile.
> >
> > (3) Whether the termination of parental rights will aid in the accomplishment of the permanent plan for

the juvenile.

(4) The bond between the juvenile and the parent.

(5) The quality of the relationship between the juvenile and the proposed adoptive parent . . . .

(6) Any relevant consideration.

N.C.G.S. § 7B-1110(a). This Court is "bound by all uncontested dispositional findings." *In re E.F.*, 375 N.C. 88, 91, 846 S.E.2d 630, 632 (2020) (citing *In re Z.L.W.*, 372 N.C. 432, 437, 831 S.E.2d 62, 65 (2019)).

¶ 12    In its disposition order, the trial court found the following facts relating to Heather's bond with her foster mother:

> 5.    The juvenile's current placement is pre-adoptive, and as such the likelihood of adoption of the juvenile is exceptionally high. [Heather's foster mother] has expressed an interest and a desire in adopting the juvenile.
>
> 6.    The juvenile has been in the custody of Stokes County DSS for six-hundred and eighty-six days as of today's hearing.
>
> 7.    That the juvenile has been in the care of her current foster mother . . . for six-hundred [and] fifty-seven days.
>
> 8.    That the juvenile had behavioral issues when she came into care. She would not hug and refused to be hugged. She banged her head [and] would stick her fingers in her ears. She has since become an affectionate a[nd] loving child who is excited and happy.
>
> 9.    In May of 2019, the juvenile cried and was not able

to look at the social worker but is now excited to see her.

10.    That the juvenile is now verbal and has friends within her community in North Carolina.

11.    A strong, loving bond exists between [the foster mother] and the juvenile. The juvenile calls [her foster mother], "Mommy", and turns to [her foster mother] when the juvenile is upset. This bond is of a very high quality.

Moreover, the trial court found the following facts as to K.T. and J.T.:

30.    That [K.T. and J.T.] have the ability to effectuate a relationship between the minor child's half-sibling and other biological family members of the minor child that reside in Maryland.

31.    That [K.T. and J.T.] are willing to provide a permanent placement for the minor child, including adoption.

32.    That but for the bond between the juvenile and [the foster mother], [K.T. and J.T.] would make suitable caretakers and custodians of the juvenile.

       . . . .

39.    That the father indicated to [K.T. and J.T.] as late as the summer of 2020 that it was likely or that he hoped for reunification with the juvenile.

40.    That the father did not contact [K.T. and J.T.] until later in the year of 2020 to see if they would be willing to be considered for placement of the juvenile.

41.    That counsel for the father proffered [K.T. and J.T.] . . . as a placement option in December of 2020.

42.    During the time the underlying abuse, neglect, [and]

dependency case was pending, [K.T. and J.T.] never asked to visit the juvenile and have still never met the juvenile.

43.  That the father knew as early as May of 2020 that [K.T. and J.T.] were willing to offer themselves as placement options.

. . . .

46.  That the father's lack of participation in this case resulted in not communicating the interest of [K.T. and J.T.] as a placement option prior to at the earliest November of 2020.

Respondent does not challenge these dispositional findings; thus, they are binding on appeal. *In re A.K.O.*, 375 N.C. at 702, 850 S.E.2d at 894 ("Dispositional findings not challenged by respondents are binding on appeal.").

¶ 13       Respondent contends that "DSS failed to inform the trial court that there were relatives who were willing and able to provide for Heather's proper care and supervision." Thus, respondent argues, "[t]he trial court was not able to consider the paternal relative[s] as Heather's 'first' placement as required by . . . N.C.[G.S.] § 7B-903(a1)." Moreover, respondent contends that the trial court's factual findings did not support the conclusion that terminating respondent's parental rights was in Heather's best interests. This is especially so, respondent contends, because the trial court also found that Heather had family members who could be a suitable placement.

¶ 14       During the initial abuse, neglect, and dependency stage of a juvenile proceeding, the Juvenile Code requires a trial court "to consider whether a relative

placement is available." *In re S.D.C.*, 373 N.C. at 290, 837 S.E.2d at 858; *see also* N.C.G.S. § 7B-900 (2021) ("If possible, the *initial approach* should involve working with the juvenile and the juvenile's family in their own home . . . ." (emphasis added)); N.C.G.S. § 7B-903(a1) (2021) ("In placing a juvenile in out-of-home care under this section, the court shall first consider whether a relative of the juvenile is willing and able to provide proper care and supervision of the juvenile in a safe home."). Under N.C.G.S. § 7B-1110(a), however, "the trial court is not expressly directed to consider the availability of a relative placement in the course of deciding a termination of parental rights proceeding." *In re K.A.M.A.*, 2021-NCSC-152, ¶ 14 (quoting *In re S.D.C.*, 373 N.C. at 290, 837 S.E.2d at 858). Rather, if the record contains evidence tending to show a relative can provide care for the juvenile, the trial court "may treat the availability of a relative placement as a 'relevant consideration' " under N.C.G.S. § 7B-1110(a)(6). *Id.* (quoting *In re S.D.C.*, 373 N.C. at 290, 837 S.E.2d at 858). Moreover, " 'the availability of a relative [placement] during the dispositional phase' . . . is not determinative." *In re C.A.D.*, 247 N.C. App. 552, 564, 786 S.E.2d 745, 752 (2016) (quoting *In re M.M.*, 200 N.C. App. 248, 258, 684 S.E.2d 463, 469 (2009)). In such a case, "the trial court should make findings of fact addressing 'the competing goals of (1) preserving the ties between the children and their biological relatives; and (2) achieving permanence for the children as offered by their prospective adoptive family.' " *In re S.D.C.*, 373 N.C. at 290, 837 S.E.2d at 858 (quoting *In re A.U.D.*, 373

N.C. at 12, 832 S.E.2d at 703–04).

¶ 15        Here the trial court appropriately balanced these competing goals. At the beginning of the case, in April and May of 2019, DSS attempted to place Heather with her various relatives. Early in the case, DSS determined that Heather's paternal grandparents would not be an appropriate placement due to their criminal history. On the day respondent stabbed Heather's maternal grandfather, Heather was initially placed with her maternal uncle. After Heather was removed from the care of her maternal uncle due to his suspected use of methamphetamines, Heather was briefly placed with her foster mother while DSS investigated other family members as placement options. Prioritizing relatives, DSS then placed Heather with her maternal great-aunt and great-uncle, although this placement was only temporary. Heather's maternal great-aunt and great-uncle subsequently encountered health problems that prevented them from continuing to care for Heather. Moreover, the maternal uncle and the maternal grandparents withdrew from consideration as relative placements on 31 May 2019. Thus, Heather was returned to her foster mother that day. At no time during this initial portion of the case, when DSS was looking for relative placements, was DSS informed of K.T. and J.T. Rather, DSS was informed of K.T. and J.T. as a placement option in November of 2020 at the earliest, well after Heather was returned to the care of her foster mother.

¶ 16        Moreover, the trial court properly treated the availability of K.T. and J.T. as a

"relevant consideration" under N.C.G.S. § 7B-1110(a)(6). The trial court found that K.T. and J.T. "would make suitable caretakers and custodians of the juvenile." The trial court also found, however, that Heather's likelihood of adoption by her foster mother was "exceptionally high" and that "[a] strong, loving bond exists between [the foster mother] and the juvenile," a bond that "is of a very high quality." The trial court further found that Heather "had behavioral issues when she came into care" and found that those issues improved while living with her foster mother. Thus, the trial court balanced the goal of preserving Heather's ties with her relatives against the goal of achieving permanence for Heather. The trial court was not required to prioritize placement with K.T. and J.T. Therefore, the trial court did not abuse its discretion by determining that termination of respondent's parental rights was in Heather's best interests. Accordingly, we affirm the trial court's orders.

AFFIRMED.